***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award, except with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in the pre-trial agreement and at the hearing before the deputy commissioner as
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, the employee-employer relationship existed between plaintiff and defendant-employer, Morton Metal Craft.
3. At all relevant times, defendant-employer was self-insured for workers' compensation purposes and Cambridge Integrated Services served as its third-party administrator.
4. A set of bound and paginated medical records was stipulated by the parties into evidence and conveyed to the deputy commissioner at the time the parties' contentions and proposed opinions and awards were due.
5. Plaintiff's claim is for an injury by accident to his back arising out of and in the course of his employment with defendants on May 30, 2001.
6. Plaintiff's average weekly wage may be determined by a Form 22 dated February 14, 2002 to be submitted by the parties at the hearing.
7. On June 20, 2001, plaintiff and defendants entered into a Form 21 agreement for the payment of total disability compensation. The Industrial Commission approved the parties' Form 21 agreement on July 26, 2001.
8. Defendants terminated payment of total disability compensation as of October 26, 2001.
9. Plaintiff maintains that the issues to be decided are as follows:
a. What is plaintiff's average weekly wage? Plaintiff maintains that the average weekly wage is $454.54 based on 356 countable days, which would yield a compensation rate of $303.02.
b. Did defendants unlawfully terminate payment of total disability compensation to plaintiff?
c. Should defendants be required to pay a penalty of 10% on all installments of total disability compensation that are more than 14 days overdue to plaintiff?
d. To what further benefits, if any, is plaintiff entitled under the Workers' Compensation Act?
e. Have defendants engaged in "stubborn, unfounded litigiousness" in the hearing of this claim, and if so, should special attorney fees under N.C. Gen. Stat. § 97-88.1 be awarded to plaintiff?
f. Should defendants be estopped from denying that plaintiff was an employee of defendants for purposes of the Workers' Compensation Act?
g. Should defendants be estopped from denying that plaintiff suffered a compensable injury by accident arising out of and in the course of his employment with defendant-employer?
h. To what credit, if any, are defendants entitled for overpayment of total disability compensation to plaintiff, and when and in what manner shall defendants be entitled to recoup any overpayment?
10. Defendants maintain that the issues to be decided are as follows:
a. Is plaintiff entitled to any additional disability benefits beyond the payments he received from June 2001 until October 26, 2001 (in the amount of $610.36 per week)?
b. If plaintiff is an illegal immigrant and fraudulently misrepresented his authorization to work in the United States (which constitutes criminal fraud according to the U.S. Supreme Court), is he entitled to continuing total disability benefits based on his alleged inability to obtain other employment?
c. Should the Form 21 Agreement be set aside based on the criminal fraud committed by plaintiff in misrepresenting his alien status and authorization to work in the United States, and should such misrepresentation thereby vitiate the third party administrator's consent to the alleged agreement?
d. Has plaintiff constructively refused suitable employment because he was terminated by his employer for making false representations and submitting false documents regarding his alien status and his authorization to work in the United States?
e. What was plaintiff's correct average weekly wage and compensation rate?
f. What credits are defendants entitled to based on their overpayment to plaintiff from approximately June 2001 to October 26, 2001 of $610.36 per week based on an alleged and incorrect average weekly wage of $915.42 per week. Defendants maintain that, according to the Form 22, plaintiff's average weekly wage is actually $452.23, which correspondence to a compensation rate of $301.49.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was born on April 29, 1970, illegally immigrated from Mexico to the United States over ten years ago. He represented to his employer that he was a high school graduate and studied engineering for six months at a college or university.
2. Although plaintiff's primary language is Spanish, he is able to speak and understand English fairly well. Plaintiff understood and answered most questions in English at the hearing before the deputy commissioner without the need for an interpreter, although an interpreter was present in Court.
3. In March 1999 plaintiff applied for work with the defendant-employer. He represented in his application for employment that he was "legally employable within the United States at the present time." Plaintiff certified on the application that the information he provided was true and correct, and acknowledged that if the information he provided in the application was false or misleading, plaintiff was subject to immediate dismissal.
4. Plaintiff was not legally authorized to work in the United States and had procured manufactured Resident Alien and Social Security cards to assist him in securing employment. On March 3, 1999 plaintiff signed an I-9 Employment Eligibility Verification wherein plaintiff certified under penalty of perjury that he was authorized to work in the United States and that he was an alien authorized to work in the United States. In connection with his I-9, plaintiff submitted a social security card and social security number, a resident alien card, and a California ID card. Plaintiff also signed W-4 and NC-4 forms providing the social security number for tax purposes. After submitting documentation of his authority to work in the United States, plaintiff began employment with defendant-employer on March 5, 1999 as a punch press or machine operator.
5. Plaintiff had been employed by defendant-employer as a machine operator for approximately two years prior to his injury. He had been hired through a temporary service known as Affordable Temporaries. Plaintiff's job as a machine operator required him to operate various types of machine shop devices, primarily punch presses that punched holes in parts being fabricated and brake presses that bent parts to customer specifications. The job is performed primarily in a standing position but defendant-employer also allows employees to request backless stools to use for supplemental body support.
6. In May 2001 defendant-employer received notice from the Social Security Administration that the name and/or social security number provided by some of their employees did not match the records of the Social Security Administration. The Social Security Administration advised defendant-employer to have the discrepancies addressed by their employees.
7. By letter dated May 21, 2001 defendant-employer advised plaintiff that he needed to correct the discrepancy between the records of the Social Security Administration and his name and social security number as reported on his wage and tax statement (Form W-2). Plaintiff was told to contact the Social Security Administration to resolve the issue as soon as possible if the information he gave to defendant-employer was accurate. Although the employer could not confirm plaintiff's receipt of this letter, it is presumed to have been delivered and received by him after being placed in the mail to him.
8. When plaintiff received the letter dated May 21, 2001, he knew that he had provided a false social security number and social security card as well as a false resident alien card and number to the employer in order to obtain employment. Although defendant-employer had no knowledge of plaintiff's status at that time, plaintiff is and always has been an illegal immigrant. Plaintiff is not authorized to work or live in the United States, and has never been authorized to work or live in the United States. Plaintiff fraudulently and illegally misrepresented his alien status to defendant-employer for the purpose of obtaining employment. Plaintiff knew he was in jeopardy of losing his job because his fraudulent social security number and card may have been detected.
9. By letter dated July 9, 2001, defendant-employer provided plaintiff with a second notice of the need to correct his name and/or social security number. Plaintiff was informed that defendant-employer could not properly process payroll without correct information. As a result, plaintiff was given until July 20, 2001 to provide corrected information or defendant-employer would have no choice but to terminate his employment. Plaintiff took no steps to provide corrected information or to otherwise address a discrepancy and therefore his employment was terminated effective July 21, 2001. Plaintiff was notified of the termination by letter dated July 23, 2001.
10. Plaintiff reported that he injured his back at work while lifting a bin of parts on May 30, 2001. On that date, plaintiff and Paul Boucher, the head of the department in which plaintiff was working at the time, were in the process of lifting heavy bins of fabricated metal parts onto a table. They were able to lift the first bin without significant difficulty, but as they lifted the second bin, plaintiff experienced a stretching sensation in his lower back followed by the onset of pain.
11. This was accepted as a compensable injury by accident by the third-party administrator, Cambridge Integrated Services. A Form 21 was submitted to plaintiff on June 20, 2001. At this time, the administrator was unaware of the issues regarding plaintiff's fraudulent misrepresentations regarding his alien status to obtain work, or regarding plaintiff's impending termination due to these false misrepresentations regarding his social security number.
12. On May 31, 2001 plaintiff presented to the North Davidson Center for Family Health, the office of Dr. Frederica J. Nanni, who is board-certified in family practice. Plaintiff was examined by Mr. Chris Caggiano, PA-C, one of Dr. Nanni's physician's assistants. Plaintiff reported that he had hurt his back the day before while lifting a heavy object and that his level of back pain was exacerbated by movement and relieved by resting in a comfortable position. Plaintiff had no complaints of radiating pain, leg pain or leg numbness at that time. After examining him, Mr. Caggiano assessed plaintiff with an acute lumbar injury and sent him to Lexington Memorial Hospital to undergo x-rays of his lumbar spine for further evaluation of the injury. Mr. Caggiano also instructed plaintiff not to return to work at that time.
13. Plaintiff was seen again by Mr. Caggione at the North Davidson Clinic on June 1, 2001. At that time it was noted that was not taking any of the prescription medications that had been prescribed for him on May 31, 2001. Mr. Caggione noted that the x-rays were normal, with no indications of any significant pathology. The assessment remained the same, a minor soft tissue injury to the back. Mr. Caggione released plaintiff to return to work the next day with the restrictions of no standing longer than 15 minutes, no heavy lifting for 10 days, no overhead work with the arms for 10 days.
14. Plaintiff did not return to work on June 2, 2001 even though he had been released to light duty. He reported to the Lexington Memorial Hospital that day, complaining of low back pain. He was given a slip to remain out of work until June 6, 2001. Plaintiff reported to the hospital staff on June 2, 2001 that the medications were not helping his back, however, this statement is in contradiction to plaintiff's representation to Mr. Caggione that he was not taking any medication as of June 1, 2001.
15. Plaintiff remained out of work at this time. Even though he had been released to work with restrictions, by Mr. Caggione, the physician's assistant, the employer could not accommodate his restrictions at that time.
16. When his latest out of work slip expired on June 6, 2001, plaintiff returned to the North Davidson Center for Family Health. He again complained of generalized back pain, with no complaints of leg pain, numbness, or radiating pain. The diagnosis as of June 6, 2001 was myofasial pain. Plaintiff requested another out of work slip and was eventually given a note saying he could return to work on June 23, 2001.
17. As of June 6, 2001, plaintiff knew or should have known that he was in the process of being terminated from his job with defendant-employer because of the fraudulent documents (false social security number and card and fraudulent alien registration card) he submitted to obtain employment, and because of his inability to address the social security number and name discrepancy.
18. Plaintiff started physical therapy on June 7, 2001 and continued physical therapy until June 20, 2001. The physical therapist detected evidence of symptom magnification and nonorganic and nonphysiological pain behavior. Plaintiff tested positive in four of five Waddell's tests, which are objective tests that are used to detect nonorganic or nonphysiological pain behavior. During the examination, plaintiff asserted that he could not independently pick each foot up off the floor, but was later observed by the physical therapist lifting his feet and his legs independently while getting into his car. As Dr. Nanni acknowledged, this is an inconsistent finding, which could be evidence of malingering. Plaintiff reported that the physical therapy did not help him.
19. Plaintiff returned to Dr. Nanni's office on June 19, 2001 and was seen by Ms. Gail Harkness, PA-C for evaluation of his progress. At that visit, although Ms. Harkness observed that plaintiff got on and off the examination table "with obvious difficulty" and she observed that he had seemed to do worse since the previous visit, she could not find objective basis for his complaints. Her exam showed that straight raises were negative and deep tendon reflexes were "trace but equal bilaterally."
20. When plaintiff returned to Dr. Nanni's office on June 25, 2001, Ms. Harkness noted that he appeared to be in acute distress and uncomfortable. He would not comply with her attempt to perform a straight leg test, due to his complaints of discomfort. Due to his ongoing complaints of pain, there was concern about a possible herniated disc and he was referred to an orthopedic specialist.
21. On June 26, 2001, plaintiff was seen by an orthopedic surgeon Karl Bolstad, M.D., on the referral of Dr. Nanni for evaluation of his low back condition. Plaintiff reported "low back pain that's bothered him for almost four weeks" as well as numbness into his feet and pain in his legs. Dr. Bolstad had difficulty examining plaintiff because he would not sit or lie down or remain still during the examination due to his level of back and lower extremity pain. Dr. Bolstad ordered an MRI scan of plaintiff's back to see if he had a ruptured lumbar disc.
22. Plaintiff returned to see Dr. Bolstad on July 12, 2001, at which time the MRI results were available. The MRI showed an annular tear at L4-5, with slight bulging of the disc and a small osteophyte at L5-S1, with no evidence of any nerve root impingement. Dr. Bolstad concluded that there was no clear-cut cause for plaintiff's complaints of pain. In his testimony, Dr. Bolstad opined that the annular tear shown on the MRI was not clinically significant. Dr. Bolstad referred plaintiff for physical therapy in the hope that it would bring relief.
23. On July 23, 2001, Dr. Bolstad's office attempted to arrange for plaintiff to undergo the therapy that Dr. Bolstad recommended. However, at that time, defendants refused to authorize the therapy or any further visits with Dr. Bolstad.
24. Notwithstanding the refusal of defendants to authorize any further treatment for plaintiff, Dr. Bolstad saw him again on August 2, 2001. On physical examination, Dr. Bolstad observed that plaintiff had muscle spasm in his lower back and that his motion was markedly limited. Straight leg raising caused some pain in his lower back at 60 degrees bilaterally. Dr. Bolstad again recommended that plaintiff undergo a supervised exercise program and that he undergo a functional capacity evaluation (FCE). Dr. Bolstad indicated that plaintiff could return for additional treatment "at the discretion of insurance carrier." Dr. Bolstad has not seen plaintiff since the August 2, 2001 visit.
25. Dr. Bolstad testified at his deposition that it was his opinion that plaintiff was totally disabled during the period of time that he treated him. He was also of the opinion that plaintiff required additional medical treatment as of the last time that he saw him. However, he also acknowledged agreement with Dr. Murray, an orthopaedic surgeon who subsequently examined plaintiff that they could find no spinal basis for his ongoing complaints and symptoms, and that as of March 2003, plaintiff could return to work.
26. Plaintiff and defendants entered into a Form 21 agreement for the payment of total disability compensation for an "undetermined" number of weeks on June 20, 2001, and the Commission approved the Form 21 agreement on July 26, 2001. Pursuant to this agreement, defendants began paying total disability compensation at the rate of $610.32 per week. This was based upon an average weekly wage of $915.42, which both parties have now acknowledged is in error.
27. Based upon the Form 22 submitted as evidence (Stipulated Exhibit 1), plaintiff had an average weekly wage of $444.48, which yields a compensation rate of $296.33.
28. While plaintiff was receiving benefits for temporary total disability, defendants unilaterally terminated these ongoing benefits effective October 26, 2001. Defendants did not file a Form 24 application with the Industrial Commission or otherwise secure an order of the Commission allowing termination of benefits.
29. After defendants refused further medical treatment, on April 8, 2002, plaintiff was able to get treatment at the Davidson Medical Ministries Clinic, a charity-based medical provider in Davidson County. Plaintiff reported that he had a "slipped disc" in his lower back for about 11 months, and that he had not been receiving medical treatment because insurance "ran out." On physical examination, it was observed that his level of strength was greater in the right lower extremity than on the left. He was diagnosed as suffering from a "slipped disc" and prescribed the anti-inflammatory medication Celebrex.
30. Plaintiff returned to the Davidson Medical Ministries Clinic on August 19, 2002. He complained of bilateral leg pain and numbness that radiated to the bottom of his feet and into his toes. He complained of bowel and bladder dysfunction as well as trouble walking, and he also complained that coughing or sneezing exacerbated his back and leg pain. The clinic arranged for plaintiff to undergo x-rays and a CT scan of the spine, which was conducted at Lexington Memorial Hospital, on August 26, 2002. While the x-ray revealed no significant pathology, the CT scan indicated "prominent bulging of the annulus fibrosus at L4-L5 with moderate spinal canal narrowing" at that level. The Clinic staff reviewed the results of the scans on August 29, 2002, and it was noted that the CT scan revealed no real disc herniation. Treatment with a trial of anti-inflammatory medications and steroids was recommended before consideration would be given to referring him to a specialist.
31. On September 17, 2002, the Clinic referred plaintiff to Johnson Neurological Clinic. Dr. Gregory Mieden examined plaintiff on November 19, 2002. On physical examination, Dr. Mieden noted that plaintiff had a slight decrease in his deep tendon reflexes in his left ankle and that he had difficulty heel-to-toe walking due to numbness and pain. He also exhibited decreased sensation to pinprick and vibration in both lower extremities but more significantly on the right. Dr. Mieden reviewed the MRI and CT scan films and noted the slightly right-sided herniated L5-S1 disc and a bulging disc at L4-L5.
32. Dr. Mieden assessed plaintiff with persistent low back pain. He said that he was not sure that he could improve plaintiff's pain level because of the length of time that had passed since his injury. Dr. Mieden prescribed steroid dosepak taper to see if that helped his condition, and if that did not help, he would give consideration to administering an epidural steroid injection at L5-S1. He ordered a nerve conduction study of plaintiff's lower extremities, and prescribed Neurontin to help plaintiff sleep. Plaintiff underwent the nerve conduction study at Lexington Memorial Hospital on November 27, 2002, the results of which were normal.
33. Plaintiff returned to see Dr. Mieden on December 10, 2002. At that time Dr. Mieden noted that the nerve conduction study was normal and that neither the steroid dosepak nor the Neurontin gave plaintiff any relief. Dr. Mieden explained to plaintiff that it was possible that he had back pain attributed to the intervertebral disc joints and in his connective tissues with no nerve damage. Dr. Mieden doubled the Neurotin prescription and told plaintiff he could try epidural injections.
34. On February 25, 2003, plaintiff had an independent medical evaluation conducted by Dr. Daniel Murrey with Charlotte Orthopedic Specialists. Plaintiff again complained of back pain radiating into his legs. Upon physical examination, Dr. Murrey found plaintiff to be guarded in his movements, and with short-stepped gait and antalgic gait with mild balance disturbance. Plaintiff was able to flex at the waist to about twenty-five percent of normal without difficulty. However, Dr. Murrey noted marked evidence of dysrhythmia and instability. Neurological testing of the lower extremities was negative, but plaintiff did exhibit a mildly-positive straight leg raising test at 80 degrees on the right side that tended to be exacerbated with movement of the ankle but not with popliteal compression.
35. Dr. Murrey reviewed prior films, the MRI from July 7, 2001 and CT scan from August 26, 2002, and noted the annular tear at L4-5 and disc protrusion. In his opinion, the disc at L5-S1 slightly displaced the right S1 nerve root. Dr. Murrey assessed plaintiff with likely discogenic lower back pain status post lumbar strain, and right S1 radiculopathy secondary to the L5-S1 disc herniation. He noted that plaintiff was "markedly deconditioned" and recommended further physical conditioning through a more extensive program.
36. Per Dr. Murrey's recommendation, plaintiff underwent a course of physical therapy at Healthsouth in Winston-Salem. In his final report, Mr. Cory Hustad, the physical therapist who conducted the program, reported to Dr. Murrey that plaintiff had been compliant with the program but that he had been slow with virtually all activities and reported high levels of pain during the program. He noted no objective signs of improvement and that plaintiff himself also reported no signs of improvement. Mr. Hustad did not recommend further physical conditioning therapy since plaintiff did not appear to have benefited from the therapy administered to date.
37. Plaintiff was seen by Dr. Murrey again on March 27, 2003. At that time, Dr. Murrey noted that the physical conditioning program had not been particularly helpful to plaintiff, and that he continued to complain of lower back pain radiating across his lower back along with some mild neurological symptoms. On physical examination, Dr. Murrey noted that plaintiff had marked dysthythmia that was consistent in the midrange of flexion and extension. Dr. Murrey observed further that plaintiff exhibited marked deconditioning of the lumbar musculature and that he had difficulty compensating for it when he was out of neutral alignment, which Dr. Murrey indicated was a sign that he had some legitimate deconditioning and muscular issues around his spine. Dr. Murrey discounted the impact of any discogentic damage on his symptoms.
38. Dr. Murrey opined that there was not much else he could do for plaintiff, who is not a candidate for surgery. He recommended that plaintiff continue to exercise at home. He also determined that plaintiff had reached maximum medical improvement and recommended that he should return to work within the restrictions he outlined. He imposed restrictions of no sitting for more than 15 minutes at a time, lifting no more than 40 pounds "rarely," lifting no more than 20 pounds "occasionally," and avoiding prolonged bending, stooping, squatting or kneeling. He also recommended that plaintiff change positions frequently. He assigned plaintiff a five percent permanent impairment rating to his back. Dr. Murrey also recommended that he pursue vocational rehabilitation to assist him in finding a job within the outlined restrictions.
39. David M. Stewart, a medical and vocational case manager for Rehab Services, LLC was assigned to assess plaintiff's situation and assist him. Mr. Stewart attended plaintiff's two visits with Dr. Murrey, monitored his participation in the physical conditioning program at Healthsouth, and produced reports to all parties summarizing what had transpired at the appointments.
40. After being qualified as an expert in vocational rehabilitation at his deposition, Mr. Stewart testified to his opinion that plaintiff is capable of working and earning wages in the United States but for his undocumented status. Mr. Stewart identified several such jobs. He identified ten positions from the U.S Department of Labor's Dictionary of Occupational Titles, which he believed Plaintiff was capable of performing. Those positions are as follows:
 POSITION DOT NO. EXERTIONAL LEVEL
 1. Cashier I 211.362-010 Sedentary
 2. Hand Painter 970.3810922 Sedentary
 3. Assembler 723.684-010 Light
 4. Assembler, Small Parts 706.684-022 Light
 5. Ballast Assembler 723.684-014 Light
 6. Bench Assembly 706.684-022 Light
 7. Counter Attendant, 311.677-014 Light
 Cafeteria (serving line)
 8. Dining Room Attendant 311.677-010 Light
 9. Fast Food Worker 311.472-010 Light
 10. Gluer 795.687-014 Light

Mr. Stewart also identified the positions of Finish Operator and Finish Utility Operator as potentially suitable for plaintiff based upon a telephone conversation with Mr. Gallimore at Morton Metalcraft.
41. Although there is some evidence that plaintiff should have been able to return to work with restrictions as of August 2001, plaintiff has not returned to work for any employer. The greater weight of the evidence is insufficient to overcome the presumption of ongoing disability raised by the Form 21. At that time plaintiff was still receiving benefits under the Form 21 and there is no evidence that defendant-employer had provided suitable employment, or that plaintiff was capable of returning to other suitable employment. The physicians treating plaintiff at the time regarded his complaints as legitimate and had kept him restricted from full duty.
42. Defendants have offered no evidence, which would rebut the presumption of ongoing disability raised by the Form 21 from October 2001 until March 2003. During this time, plaintiff had some additional, if sporadic medical treatment. The physicians who examined him during that period seemed to find his complaints legitimate. Defendants have not presented sufficient convincing evidence that plaintiff was capable of returning to any gainful employment during this time period.
43. The competent evidence of record is sufficient to establish that as of March 27, 2003, when plaintiff was rated and released to return to employment by Dr. Murrey, he was capable of working in sedentary to light duty employment. None of plaintiff's treating physicians have opined that plaintiff is not at this time physically able to work in any capacity. Both Dr. Bolstad and Dr. Murrey opined that plaintiff is physically able to work in some capacity, and Dr. Murrey has outlined appropriate restrictions.
44. The evidence establishes that at the time Dr. Murrey released plaintiff to return to work, there were positions available within plaintiff's restrictions and for which he was qualified. The medical and vocational evidence establishes that such suitable employment would be available for plaintiff but for his status as an illegal immigrant.
45. Plaintiff is not legally employable in the United States due to his illegal immigrant status. At this time, any of plaintiff's inability to obtain employment is not related to his compensable work related injury, but rather is related to plaintiff's status as an illegal immigrant not authorized to live or work in the United States.
46. By March 27, 2003, when he was rated and released by Dr. Murrey, plaintiff had reached maximum medical improvement. He retains a five percent permanent impairment to his back due to his injury by accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Although the employee in a workers' compensation case generally bears the burden of initially proving each and every element of compensability, where the parties enter a Form 21 agreement for payment of ongoing total disability benefits, a presumption of disability arises, which defendants may then rebut by competent evidence. Kisiah v.W.R. Kisiah Plumbing, 124 N.C. App. 72 (1996).
2. Defendants have failed to establish that plaintiff's period of temporary total disability ended as of October 26, 2001 or that they were otherwise entitled to terminate benefits to plaintiff as of that date. When defendants wrongfully terminated payment of total disability benefits to plaintiff as of October 26, 2001, defendants shall owe a penalty of ten percent on all installments of compensation that shall be awarded in this Opinion and Award which are overdue by fourteen (14) days pursuant to N.C. Gen. Stat. § 97-18(g).
3. Plaintiff is not precluded from receiving workers' compensation benefits even though he is not legally authorized to work in the United States. Ruiz v. Belk Masonry Company, 356 N.C. 166 (2002).
4. The evidence is insufficient to rebut the presumption of ongoing disability prior to Dr. Murrey's assessment and release of plaintiff to return to light duty as of March 27, 2003, and the corresponding vocational evidence of available suitable employment. As of March 27, 2003, plaintiff had reached maximum medical improvement. The medical and vocational evidence establishes that as of that date, he was and now is capable of earning wages in some capacity. Defendants are responsible for paying plaintiff compensation for temporary total disability from October 26, 2001 through March 27, 2003 at the rate as determined by the Commission pursuant to the Form 22. N.C. Gen. Stat. § 97-29.
5. Based upon the Form 22 in evidence, plaintiff had an average weekly wage of $444.48, which yields a compensation rate of $296.33. N.C. Gen. Stat. § 97-2(5).
6. Plaintiff has reached maximum medical improvement as of March 27, 2003, and sustained a five percent permanent impairment to his back as a result of his compensable injury by accident for which he is entitled to fifteen weeks of compensation pursuant to N.C. Gen. Stat. § 97-31(23).
7. Defendants are entitled to a credit for overpayment of benefits, which were paid at the incorrect higher compensation rate, and may seek a credit at the end of the period for which compensation is due pursuant to N.C. Gen. Stat. § 97-42.
8. Plaintiff is entitled to medical compensation for his injury, and defendants shall pay for all such reasonably necessary medical treatment rendered to date, which tended to effect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. §§ 97-25, 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff compensation at the rate of $296.33 per week from October 27, 2001 through March 27, 2003 as temporary total disability compensation. Such benefits shall be paid in a lump sum, along with any ten percent penalty, subject to attorney's fees.
2. Defendants shall pay a penalty of ten percent on all overdue installments of compensation awarded to plaintiff in Paragraph 1 of this Award.
3. Defendants shall pay plaintiff compensation at the rate of $296.33 per week for 15 weeks, beginning March 27, 2003 for his five percent permanent impairment to his back.
4. Defendants are entitled to a credit for overpayments and may deduct from the lump sum due, all amounts overpaid to plaintiff at the higher incorrect compensation rate.
5. Defendants shall pay for all reasonably necessary medical treatment provided to plaintiff to date that tended to effect a cure, give relief, or lessen the period of disability caused by plaintiff's injury.
6. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation and late-payment penalties awarded in Paragraphs 1 2 is hereby approved for plaintiff's counsel of record to be paid by defendants.
7. Defendants shall pay the costs.
This the 21st day of January 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DCS/llc